## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| PAUL RAYMOND KNAPP, | ) | CASE NO.  5:18CV01779 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Paul Raymond Knapp, ("Plaintiff" or "Knapp"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

## I.   PROCEDURAL HISTORY

In June 2015, Knapp filed an application for POD, DIB, and SSI, alleging a disability

onset date of June 15, 2013 and claiming he was disabled due to memory problems following a

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

brain surgery, a brain tumor, memory loss, seizures, and a left leg limp.  (Transcript ("Tr.") 206, 210, 234.)  The applications were denied initially and upon reconsideration, and Knapp requested a hearing before an administrative law judge ("ALJ").  (Tr. 127, 145, 157.)

On September 7, 2017, an ALJ held a hearing, during which Knapp, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 36.)  On September 21, 2017, the ALJ issued a written decision finding Knapp was not disabled.  (Tr. 7.)  The ALJ's decision became final on May 30, 2018, when the Appeals Council declined further review.  (Tr. 1.)

On August 1, 2018, Knapp filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 15, 16.)  Knapp asserts the following assignment of error:

> (1)  The residual functional capacity determination is unsupported by substantial evidence because the ALJ improperly excluded disabling portions of the favorably weighed opinion from consultative psychologist Dr. Dallara.

(Doc. No. 13.)

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Knapp was born in March 1963 and was 54 years-old at the time of his administrative hearing, making him a "person closely approaching advanced age" under social security regulations.  (Tr. 18.)  *See* 20 C.F.R. §§ 404.1563(d) & 416.963(d).  He has a high school education and is able to communicate in English.  (*Id.*)  He has past relevant work as a computer technician.  (*Id.*)

2

**B.** **Medical Evidence**[2]

On September 14, 2007, Knapp visited primary care physician James Bailey, M.D., requesting a doctor's note to return to work after having a seizure.  (Tr. 291.)  Knapp indicated he "went out" during the episode and it was unlike his prior seizures.  (*Id*.)  He went to the hospital following this seizure and his potassium level was low.  (*Id*.)  On examination, Knapp had a normal gait, no tremor, and full strength in his upper and lower extremities.  (*Id*.)  Dr. Bailey refilled Knapp's Dilantin and referred him to a neurosurgeon.  (*Id*.)  Dr. Bailey and Knapp also "discussed driving limitations" and Dr. Bailey concluded Knapp could return to work if he was able to arrange being in a carpool.  (*Id.*)

On July 26, 2010, Knapp saw neurologist Selwyn-Lloyd McPherson, M.D.  (Tr. 353.)  Knapp reported he had been having memory problems since his brain surgery.  (*Id*.)  He indicated stress exacerbated his memory problems and described daily short term memory issues.  (*Id*.)  On examination, Knapp had normal attention, concentration, judgment, and thought content.  (Tr. 355.)  His gait was normal, he had no tremor, and full strength in his upper and lower extremities.  (Tr. 356.)  Dr. McPherson diagnosed Knapp with memory impairment and mild memory disturbance.  (*Id.*)  He advised Knapp to continue taking his Dilantin and ordered several tests to evaluate him for dementia.  (*Id*.)

Knapp underwent several diagnostic tests on August 10, 2010.  (Tr. 351.)  His EEG and PG 300 testing were normal.  (*Id*.)  A Connors' CPT was abnormal and "supportive of inattentiveness."  (*Id*.)  His mini mental status examination was normal except for a low Gama IQ

---

[2]    The Court's recitation of the evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.

score of 95.  (*Id.*)  This score placed him in the 37th percentile.  (*Id.*)  Knapp returned to Dr.

McPherson on August 31, 2010 to review these results.  (*Id.*)  Dr. McPherson observed Knapp

had improved cognitive function on Adderall and renewed Knapp's Dilantin and Adderall

prescriptions.  (Tr. 351-352.)

Knapp returned to Dr. McPherson on October 5, 2010.  (Tr. 349.)  Dr. McPherson again

noted Knapp had improved cognitive function with medication.  (*Id.*)  On November 10, 2010,

Knapp reported he found his Adderall helpful and requested an increased dosage.  (Tr. 347.)  He

denied any seizure activity.  (*Id.*)

On May 20, 2015, Knapp visited Dr. Bailey, reporting he stopped seeing Dr. McPherson

due to a change in health insurance.  (Tr. 323.)  He continued to take Dilatin and reported no

seizures for a "long time."  (*Id.*)  Knapp also reported depression.  (*Id.*)  Dr. Bailey refilled

Knapp's Dilantin and ordered a colonoscopy.  (Tr. 324.)  Knapp returned to Dr. Bailey on

November 18, 2015 and denied any recent seizures.  (Tr. 320.)  On examination, he had full

strength in his upper and lower extremities, normal coordination, and normal gait.  (Tr. 321.)  Dr.

Bailey refilled Knapp's Dilantin.  (*Id.*)

Knapp saw Dr. McPherson on December 5, 2015.  (Tr. 305.)  He reported stress

exacerbated his memory deficits.  (Tr. 307, 308.)  He denied any weakness in his legs or joint

pain, but endorsed fatigue, low energy, and nervousness.  (Tr. 310.)  On examination, Knapp had

delayed memory for both recent and remote events, delayed attention, but normal concentration,

judgment, and thought content.  (Tr. 313.)  He had a normal gait, no tremor, and normal muscle

tone.  (Tr. 313, 315.)  He also had full strength in his upper and lower extremities.  (Tr. 314.)  Dr.

McPherson renewed Knapp's Dilantin.  (Tr. 315.)

On January 30, 2017, Knapp saw Dr. Bailey, reporting no seizure activity in a "long time." (Tr. 317.)  Dr. Bailey renewed Knapp's Dilantin prescription.  (*Id.*)  On examination, Knapp had full strength in his upper and lower extremities, a normal gait, and normal coordination.  (Tr. 318.)

On July 13, 2017, Knapp underwent a diagnostic assessment at Coleman Professional Services with social worker Karla Lang, LISW.  (Tr. 358.)  Knapp indicated his father and brother had encouraged him to seek counseling due to worsening symptoms since a 2003 brain tumor operation.  (*Id.*)  He described significant issues with memory, paranoia, and focus.  (*Id.*)  Knapp reported he had withdrawn from his family because he believed they laughed at him, were against him, and did not like him.  (Tr. 359.)  His father, who was in attendance at the appointment, stated these beliefs were unfounded.  (*Id.*)  Knapp relayed he did not think he could work due to his memory impairment and a concern with how others would treat him.  (Tr. 361.)  He also reported seizures, anxiety, and difficulty adapting to change.  (Tr. 364, 366.)  On examination, Knapp displayed a logical thought process, unremarkable thought content, but slowed responses and recall.  (Tr. 370, 371.)  Ms. Lang diagnosed dysthymic disorder, generalized anxiety disorder, and adjustment disorder.  (Tr. 374.)

Knapp returned to Coleman Professional Services for counseling with Lisa Manderino on July 31, 2017.  (Tr. 377.)  He reported significant stress and anxiety.  (*Id.*)  Knapp conveyed skepticism that counseling would improved his symptoms because he believed his issues were physiological in nature.  (Tr. 378, 380.)  He reported he found social situations stressful and this "social anxiety has prevented him from seeking work just as much as his cognitive impairment." (Tr. 380.)  Upon examination, he appeared anxious but was cooperative.  (Tr. 378.)  He agreed to

see a counselor every two weeks.  (Tr. 380.)

**C.      State Agency Reports**

**1.          Mental Impairments**

On November 4, 2015, Knapp underwent a consultative examination with psychologist Robert F. Dallara, Ph.D.  (Tr. 295.)  Knapp reported "difficulties working due to problems with his memory."  (*Id*.)  He relayed his memory problems began after a 2003 brain tumor operation. (Tr. 296.)  Beyond his memory issues, he "denied any history of difficulties completing his work, relating to others, or coping with work demands due to mental or emotional difficulties."  (*Id*.)

During the examination, Knapp made adequate eye contact and was cooperative.  (*Id*.) His "thinking was generally logical and clear but he would lose his train of thought at times." (*Id*.)  Knapp described depression and nervousness.  (Tr. 297.)  He was unable to count from one to forty by threes, but "did fair at serial subtraction."  (*Id*.)  He could recall one item out of three after a five-minute period.  (*Id*.)  Dr. Dallara administered the WAIS-IV and Knapp obtained a verbal comprehension score of 92, perceptual reasoning score of 86, working memory score of 77, processing speed score of 81, and a full scale IQ score of 82.  (*Id*.)  His full scale IQ score fell into the low-average range.  (Tr. 297-298.)  He displayed short-term memory deficits.  (Tr. 298.) Dr. Dallara also administered the WMS-IV to assess Knapp's memory function.  (*Id*.)  Knapp's "delayed memory index fell in the extremely low range; while the remainder of the indexes fell in the borderline range and nevertheless did suggest the possibility of retention deficits."  (Tr. 298.)

Based upon this evaluation, Dr. Dallara diagnosed cognitive disorder and depression and assigned Knapp a Global Assessment of Functioning[3] ("GAF ") score of 55.  (*Id*.)  He provided

---

[3]        The GAF scale reports a clinician's assessment of an individual's overall level
of functioning.  An individual's GAF is rated between 0-100, with lower numbers

the following opinion on Knapp's abilities and limitations:

> **Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions.**
>
> The claimant reported average grades in a regular education classroom setting in high school.  He also states he obtained an associate degree.  His presentation during the examination as well as the WAIS-IV suggests intellectual functioning in the extremely low range.  He would be expected to be able to understand instructions in a work setting consistent with low [average] intellectual abilities.  However he may have some difficulties remembering or carrying out simple one or two-step instructions.
>
> **Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks, and to perform multi-step tasks.**
>
> Paul did not report a pattern of leaving work due to emotional or mental difficulties.  There was no direct evidence during the examination to suggest impairment to his persistence or pace.  At times he did forget the task at hand and required reinstruction.  This may prompt performance concerns by others.
>
> **Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.**
>
> The claimant made an essentially unremarkable social presentation during the examination.  No information was provided to indicate inappropriate comportment during his work history.  However due to his cognitive issues and depression he may have some difficulties relating to others including fellow workers and supervisors.
>
> **Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.**
>
> The claimant denied treatment by a psychologist, psychiatrist, or other

---

indicating more severe mental impairments.  A GAF score between 51 and 60 indicates moderate symptoms or any moderate impairment in social, occupational or school functioning.  A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

> mental health professional.  He did not report a pattern of inability to adjust
> to workplace demands, nor did he describe a history of mental or emotional
> deterioration in response to work exposure.  However due to his depression
> and cognitive issues, he may have some difficulties withstanding stress and
> pressures associated with day-to-day work activity.

(Tr. 299.)

On November 11, 2015, state agency psychologist Marjorie Kukor, Ph.D., reviewed Knapp's medical records and completed a Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity ("RFC") Assessment.  (Tr. 73-74; 77-79.)  Dr. Kukor concluded Knapp had (1) mild restrictions in activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, and pace; and (4) no episodes of decompensation.  (Tr. 73.)  As for his mental RFC, Dr. Kukor concluded Knapp was moderately limited in his abilities to (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (4) interact appropriately with the general public; and (5) respond appropriately to changes in the work setting.  (Tr. 77-78.)  Dr. Kukor found no significant limitations in Knapp's abilities to (1) remember locations and work-like procedures; (2) understand, remember, and carry out very short and simple instructions; (3) perform activities without a schedule, maintain regular attendance, and be punctual within customary tolerances; (4) work in coordination with or in proximity to others without being distracted by them; (5) make simple work-related decisions; (6) ask simple questions or request assistance; (7) accept instructions and respond appropriately to criticism from supervisors; (8) get along with coworkers or peer without distracting them or

exhibiting behavioral extremes; (9) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; (10) be aware of normal hazards and take appropriate precautions; (11) travel in unfamiliar places or use public transportation; and (12) set realistic goals or make plans independently of others.  (*Id*.)  Dr. Kukor explained the basis of her decision as follows:

> [Claimant] could understand and remember 1-3 step tasks which are not detailed.  For more extensive instructions, [claimant] will need written or verbal reminders.
>
> ***
>
> [Claimant] is able to carry out 1-3 step instructions.  He will need written or verbal reminders when learning more complex tasks, and may require intermittent reminders after initially learning them. [Claimant] will need flexibility with breaks and schedules when working with strict productivity or time demands.
>
> ***
>
> [Claimant] can work with general public for brief, superficial interactions that do not require resolving problems or addressing customer complaints. [Claimant] can work with small number of co-workers or by self. [Claimant] works best on individual projects.
>
> ***
>
> [Claimant] will need major changes previewed and gradually implemented to allow him time to learn and accommodate to new expectations.

(Tr. 77-79.)

On March 18, 2016, state agency psychologist Joseph Edwards, Ph.D., reviewed Knapp's medical records and completed a PRT and Mental RFC Assessment.  (Tr. 101-102; 105-107.)  He adopted the findings of Dr. Kukor.  (*Id*.)

### 2.     Physical Impairments

On September 30, 2015, state agency physician Maria Congbalay, M.D., reviewed Knapp's medical records and completed a Physical RFC Assessment.  (Tr. 75-76.)  Dr. Congbalay determined Knapp could lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday.  (Tr. 75.) She further found Knapp could occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl.  (Tr. 75-76.)  Dr. Congbalay concluded Knapp could not work at unprotected heights, perform commercial driving, or use heavy machinery.  (Tr. 76.)

On March 19, 2016, state agency physician Stephen Sutherland, M.D., reviewed Knapp's medical records and completed a Physical RFC Assessment.  (Tr. 103-105.)  He adopted the findings of Dr. Congbalay, except he found Knapp could frequently climb ramps and stairs and never climb ladders, ropes, and scaffolds.  (*Id*.)

### D.     Hearing Testimony

During the September 7, 2017 hearing, Knapp testified to the following:

- He graduated from high school.  (Tr. 40-41.)  He has a driver's license.  (Tr. 41.)  He lives by himself.  (*Id*.)

- He had brain surgery in 2003.  (Tr. 42.)  He has seizures and has had two in the last three months.  (*Id*.)  He takes Dilantin, which causes paranoia.  (Tr. 41.)

- He does not remember what happens during or after a seizure.  (Tr. 42-43.)  He is tired after having a seizure.  (Tr. 43.)  He does not have any driving restrictions due to his seizures.  (*Id*.)

- Just prior to having a seizure, he will see "flashing" in his peripheral vision.  (Tr. 44.)

- He recently began visiting Coleman Professional Services for depression.  (Tr.

10

44.)  He does not like to interact with others and tends to "push" his family away. (Tr. 45.)

• He is able to do his own cooking, cleaning, and grocery shopping.  (Tr. 46.)  He drives and has a vehicle.  (*Id*.)  When he goes grocery shopping, he often will forget items he planned to purchase.  (Tr. 49.)

• He last worked in 2013 as a computer technician.  (Tr. 46-47.)  He was fired due to "having trouble getting along with the people there."  (Tr. 47.)  He does not think he could return to this type of job because he has "been out of it too long" and has difficulty "relating with people."  (*Id*.)

• He had trouble retaining new information at his last job.  (Tr. 48.)  He continues to have short-term memory problems.  (Tr. 49.)

• When he is stressed, his left leg will drag slightly.  (Tr. 51.)  The left side of his body is "a little bit weaker" and he does not like to climb ladders.  (*Id*.)

Prior to the hearing, the VE reported Knapp had past work as a computer technician (D.O.T. #039.264-010).  (Tr. 281.)  At the hearing, the ALJ determined Knapp's past relevant work would be excluded "based on the skill level."  (Tr. 53.)  The ALJ then posed the following hypothetical question:

For the first hypothetical, Ms. Smith, please consider a hypothetical individual that can lift, carry, push, and pull 20 pounds occasionally and 10 frequently.  This person can sit for six [h]ours, can stand and/or walk for six hours in a normal workday.  This person cannot climb ladders, ropes, or scaffolds and can occasionally climb ramps and stairs.  This individual must avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery.  The hypothetical individual cannot perform any work-related driving.  The hypothetical individual would further be limited to only simple, routine tasks that do not involve arbitration, negotiation, or confrontation.  The hypothetical individual cannot direct the work of others and cannot be responsible for the safety or welfare of others.  The individual cannot perform piece rate work or assembly line work.  And this individual would be limited to occasional interaction with others.

(Tr. 53-54.)

The VE testified the hypothetical individual would be able to perform representative jobs

11

in the economy, such as laundry worker (D.O.T. #302.685-010), mail clerk (D.O.T. #209.687-062), and office helper (D.O.T. #239.567-010).  (Tr. 54.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe

12

impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Knapp was insured on his alleged disability onset date, June 15, 2013, and remained insured through December 31, 2018, his date last insured ("DLI.")  (Tr. 12.)  Therefore, in order to be entitled to POD and DIB, Knapp must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2.    The claimant has not engaged in substantial gainful activity since June 15, 2013, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

13

3.   The claimant has the following severe impairments: Epilepsy, organic brain syndrome, depressive disorder, generalized anxiety disorder and adjustment disorder (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he could never climb ladders, ropes or scaffolds, he could occasionally climb ramps and stairs.  He must avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery.  He cannot perform work related driving.  The claimant is limited to simple, routine tasks that do not involve arbitration, negotiation, confrontation, directing the work of others or being responsible for the safety or welfare of others.  The claimant cannot perform piece rate work or assembly line work.  The claimant is limited to occasional interaction with others.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on March **, 1963 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from June 15, 2013, through the date of this decision (20 CFR

14

404.1520(g) and 416.920(g)).

(Tr.12-19.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the

15

conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

In his sole assignment of error, Knapp argues the "ALJ improperly excluded disabling

16

portions" of the consultative examiner's opinion.  (Doc. No. 13 at 3.)  Knapp maintains the ALJ's

treatment of the consultative examiner's opinion renders the RFC "unsupported by substantial

evidence."  (*Id*.)  Knapp asserts that while the ALJ assigned "great" weight to the consultative

examiner's opinion, he "failed to properly explain why likely disabling portions of Dr. Dallara's

opinion were rejected."  (*Id.* at 11.)

The Commissioner maintains the ALJ properly considered the opinion of the

consultative examiner.  (Doc. No. 15 at 6.)  The Commissioner asserts the consultative

examiner's findings were "extremely broad and non-specific" and Knapp does not explain how

these "general assessments undermined the ALJ's RFC findings."  (*Id.* at 8.)  The Commissioner

concludes "given the lack of inconsistency" between the RFC and the opinion, Knapp "has not

shown how the ALJ's evaluation" of the opinion is reversible error.  (*Id*. at 10.)

In formulating the RFC, ALJs "are not bound by any findings made by State agency

medical or psychological consultants, or other program physicians or psychologists."  20 C.F.R.

§ 404.1527(e)(2)(i)[4].  Nonetheless, because "State agency medical and psychological consultants

and other program physicians, psychologists, and other medical specialists are highly qualified

physicians, psychologists," ALJs must consider their findings and opinions.  *Id*.  When doing so,

an ALJ "will evaluate the findings using the relevant factors[5] in paragraphs (a) through (d) of this

---

[4]     Revised versions of these regulations took effect on March 27, 2017 and apply to
        disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27,
        2017).

[5]     These factors include the relationship and frequency of examination, the nature
        and extent of the treatment relationship, how well-supported the opinion is by
        medical signs and laboratory findings, its consistency with the record as a whole,
        the treating source's specialization, the source's familiarity with the Social
        Security program and understanding of its evidentiary requirements, and the
        extent to which the source is familiar with other information in the case record

17

section, such as the consultant's medical specialty and expertise in our rules, the supporting

evidence in the case record, supporting explanations the medical or psychological consultant

provides, and any other factors relevant to the weighing of the opinions."  20 C.F.R. §

404.1527(e)(2)(ii).  Finally, an ALJ "must explain in the decision the weight given to the opinions

of a State agency medical or psychological consultant or other program physician, psychologist,

or other medical specialist" unless a treating physician's opinion has been accorded controlling

weight.  *Id.*

As noted *supra*, Knapp underwent a mental consultative examination with psychologist

Robert F. Dallara, Ph.D., on November 4, 2015.  (Tr. 295.)  The ALJ discussed Dr. Dallara's

opinion as follows:

> At the request of the Bureau of Disability Determination, Robert Dallara,
> Jr., Ph.D., conducted a consultative examination of the claimant on
> November 4, 2015, in which he administered psychological testing.  The
> claimant reported problems with his memory since removal of a brain tumor
> in 2003, which he attributed to his inability to work (Ex. 3F, 2).  However,
> he denied problems relating to others, coping with work demands or
> difficulties completing work.  He cooked meals, shopped and did laundry as
> well as performed household chores (Ex. 3F, 3).  His thinking was logical
> and clear although he did lose his train of thought at times, and while he did
> not display signs of anxiety, he reported feeling nervous and depressed.
> However, he denied suicidal and homicidal ideation as well as crying spells
> (Ex. 3-4).  Dr. Dallara estimated the claimant's intelligence was in the low
> average range and administration of the Wechsler Adult Intelligence Scale-
> IV (WAIS-IV) revealed a full scale IQ of 82, with a verbal comprehension
> composite of 92, perceptual reasoning composite of 86, working memory
> composite of 77 and processing speed composite of 81.  Administration of
> the Wechsler Memory Scale-IV (WMS-IV) revealed an auditory memory
> index of 77, visual memory index of 76, visual working memory index of
> 73, and immediate memory index of 78, which fell in the borderline range;
> however, he achieved a delayed memory index of 67, which fell in the
> extremely low range, suggesting the possibility of retention deficits.  Dr.
> Dallara diagnosed the claimant with Cognitive Disorder, NOS and

relevant to the decision.  20 CFR §416.1527(c)(1)-(6).

18

Depression, NOS on Axis I and assigned a GAF of 55 (Ex. 3F, 4-5).

While testing supports cognitive deficits, the claimant retains the functional capacity to perform work that is simple and routine.  Dr. Dallara noted that the claimant would be expected to understand instructions in a work setting consistent with low average intellectual abilities.  However, he opined that the claimant may have some difficulties remembering and carrying out simple one or two-step instructions noting the WAIS-IV suggested an extremely low range of intellectual functioning (Ex. 3F, 6).  While I considered the difficulty the claimant may have in this area, he carries out one or two-step instructions driving to appointments, following instructions to take medication, and preparing meals.  Dr. Dallara noted there was no evidence suggesting impairment in persistence or pace but he observed that the claimant required reinstruction due to forgetting "the task at hand," which may prompt performance concerns by others.  He observed that the claimant's social presentation was essentially unremarkable; however, Dr. Dallara opined that due to his cognitive issues and depression, he may have some difficulties relating to others.  In addition, he opined that due to his depression and cognitive issues, he may have some difficulties withstanding stress and pressures associated with day to day work activity (*Id*).  While I considered the difficulties related to the claimant's cognitive issues as well as depression, the residual functional capacity provides for occasional interaction with others and reduces activities prompting stress such as having responsibility for others or managing situations involving conflicts or agreements.

(Tr. 15-16.)  Later in the decision, the ALJ weighed Dr. Dallara's opinion as follows

As for the opinion evidence, I give great weight to Dr. Dallara's psychological assessment of the claimant and limitations he assessed.  His opinion is based on psychological testing and is commensurate with the evidence.

(Tr. 17.)

The Court finds the ALJ properly evaluated Dr. Dallara's opinion.  The ALJ discussed Dr. Dallara's examination findings and expressly acknowledged his opinions regarding Knapp's mental limitations.  (Tr. 15-16.)  The ALJ accorded "great weight" to Dr. Dallara's opinions and provided several reasons for doing so.  Specifically, the ALJ recognized Dr. Dallara's conclusions were based upon psychological testing and "commensurate with the evidence."  (Tr. 17.)  The

19

ALJ also discussed, at length, the results of the WAIS-IV and WMS-IV testing from the consultative examination, as well as the subjective complaints and abilities Knapp voiced to Dr. Dallara. (Tr. 15-16.) The ALJ also discussed and reviewed Knapp's neurological and counseling treatment notes prior to weighing Dr. Dallara's opinion. (Tr. 16-17.) After this careful review, the ALJ then provided two reasons for why he was affording Dr. Dallara's opinion "great weight." (Tr. 17.) Procedurally, the regulations require no more.

Knapp contends because the ALJ assigned Dr. Dallara's opinion "great weight," the ALJ was required to explain any deviation between the opinion and the RFC. (*See* Doc. No. 16 at 2.) The Court rejects this argument. When an ALJ accords "great weight" to a medical opinion, the ALJ is not required to adopt every facet of the opinion expressed by the medical source. *See Taylor v. Colvin*, 2013 WL 6162527 at *15 (N.D.Ohio Nov.22, 2013) (finding ALJ was not required to adopt every opinion of an ME "by virtue of the fact that, overall, he gave [the ME's] opinion great weight"). *See also White v. Comm'r of Soc. Sec*., 2013 WL 4817673 at * 16 (N.D.Ohio 2013) (noting that "[t]he fact that the ALJ did not incorporate all of Dr. Castor's restrictions, despite attributing significant weight to his opinion, is not legal error in and of itself"); *Smith v. Comm'r of Soc. Sec*., 2013 WL 1150133 at * 11 (N.D. Ohio Mar. 19, 2013). Thus, although the ALJ assigned "great weight" to Dr. Dallara's opinion, he was not required to include all of Dr. Dallara's limitations in the RFC or "explain why he did not adopt all of [the] limitations." *Hedick v. Berryhill*, 2018 WL 6348759, *6 (N.D. Ohio Nov. 14, 2018), *report and recommendation adopted by* 2018 WL 6344611 (N.D. Ohio Dec. 4, 2018). .

Moreover, to the extent there are any deviations between the RFC and Dr. Dallara's conclusions, the ALJ provided an explanation in the decision. The ALJ acknowledged Dr.

20

Dallara's conclusion Knapp "may have some difficulties remembering and carrying out simple one or two step instructions." (Tr. 16.) The ALJ explained while he "considered the difficulty [Knapp] may have in this area," Knapp had demonstrated he was able to carry out simple one or two step instructions by driving himself to appointments, taking his medications, and preparing meals. (*Id*.) The ALJ accordingly limited Knapp to simple, routine tasks in the RFC. (Tr. 14.) While Knapp argues "a limitation to simple and routine tasks does not correspond with difficulties carrying out simple one or two-step instructions," the ALJ was not required to include Dr. Dallara's limitation in the RFC and he provided an explanation as to why he chose not to do so. (*See* Doc. No. 13 at 13.)

Knapp asserts the explanation the ALJ provided for discounting Dr. Dallara's conclusion is insufficient. (Doc. No. 13 at 14.) He maintains the activities the ALJ cited are "things [he] had previously done in the past, which is not the same thing as learning and retaining the skills for a new job." (*Id*.) Knapp cites to evidence which he believes "shows [he] would likely forget one to two step tasks and need constant reminders which is not contemplated by the RFC." (*Id*.)

As an initial matter, the Court notes Dr. Dallara concluded Knapp "*may* have some difficulties remembering or carrying out simple one or two-step instructions." (Tr. 299.) (emphasis added) This conclusion does not definitively state Knapp could not perform one or two step instructions. Rather, Dr. Dallara is suggesting Knapp may have some difficulties in this area, but does not provide a specific limit for Knapp.

Moreover, substantial evidence supports the ALJ's determination Knapp was not completely precluded from performing one and two step tasks. The ALJ discussed Knapp's report he "lives alone, cooks, drives and performs household chores" and "uses a checkbook and

21

handles a savings account." (Tr. 14, 17.)  The ALJ acknowledged Knapp's low average IQ scores and low memory scores. (Tr. 16.)  The ALJ also discussed Knapp's treatment notes, which confirmed "delayed memory for recent and remote events," but "normal concentration, judgment, vocabulary and fund of knowledge for current, recent and remote events" and "a normal rate of processing information, content, abstract reasoning and computation." (*Id.*)  The ALJ observed Knapp reported "difficulty remembering simple things" to his counselor, but had a normal, logical thought process. (Tr. 17.)  The evidence of record also indicates Knapp's cognitive function was improved with Adderall and Dr. McPherson, his neurologist, categorized his memory impairment as "mild." (Tr. 349, 350.)

Knapp further argues the "RFC includes nothing regarding difficulties withstanding stress and pressures associated with day-to-day work activity." (Doc. No. 13 at 13.)  The Court disagrees.  Within his opinion, Dr. Dallara found Knapp "may have some difficulties withstanding stress and pressures associated with day-to-day work activity." (Tr. 299.)  Similar to his opinion regarding one and two step tasks, Dr. Dallara's conclusion was not definitive and did not provide exact limits upon Knapp's ability to handle stress and pressure.  The ALJ accounted for Knapp's difficulties with stress and pressure in the RFC, by limiting Knapp to (1) no arbitration, negotiation, confrontation, directing the work of others or being responsible for the safety or welfare of others; (2) no piece rate work or assembly line work; and (3) occasional interaction with others. (Tr. 14.)

Moreover, within the decision, the ALJ acknowledged Dr. Dallara's conclusion regarding stress and pressure. (Tr. 16.)  The ALJ also noted Knapp found it stressful to be around others. (Tr. 17.)  The ALJ explained he considered Knapp's difficulties in these areas when

22

formulating the RFC and provided for "occasional interaction with others and reduce[d] activities

prompting stress such as having responsibility for others or managing situations involving

conflicts or agreements."  (Tr. 16.)  Thus, the ALJ fully accounted for Dr. Dallara's observation

Knapp may have difficulty withstanding stress and pressure.

Knapp contends the ALJ did not provide "nearly enough of a limitation" in the RFC to

account for Dr. Dallara's conclusions in this area.  (Doc. No. 13 at 16.)  Citing to SSR 85-15,

Knapp argues restricting him from a managerial position does not fully account for his ability to

handle stress because "stress can affect even the simplest work tasks far removed from the

management spectrum."  (*Id.* at 16.)  While SSR 85-15 does observe[6] stress manifests itself in

---

[6]     SSR 85-15 provides, in pertinent part:

> The reaction to the demands of work (stress) is highly individualized, and mental
> illness is characterized by adverse responses to seemingly trivial circumstances.
> The mentally impaired may cease to function effectively when facing such
> demands as getting to work regularly, having their performance supervised, and
> remaining in the workplace for a full day.  A person may become panicked and
> develop palpitations, shortness of breath, or feel faint while riding in an elevator;
> another may experience terror and begin to hallucinate when approached by a
> stranger asking a question.  Thus, the mentally impaired may have difficulty
> meeting the requirement of even so-called "low stress" jobs.
>
> Because response to the demands of work is highly individualized, the skill level
> of a position is not necessarily related to the difficulty an individual will have in
> meeting the demands of the job.  A claimant's condition may make performance
> of an unskilled job as difficult as an objectively more demanding job, for
> example, a busboy need only clear dishes from tables.  But an individual with a
> severe mental disorder may find unmanageable the demand of making sure that he
> removes all the dishes, does not drop them, and gets the table cleared promptly
> for the waiter or waitress.  Similarly, an individual who cannot tolerate being
> supervised may be not able to work even in the absence of close supervision; the
> knowledge that one's work is being judged and evaluated, even when the
> supervision is remote or indirect, can be intolerated for some mentally impaired
> persons.  Any impairment-related limitations created by an individual's response
> to demands of work, however, must be reflected in the RFC assessment.

variety of ways in the workplace, it also acknowledges the reaction to stress is "highly individualized" and does not "set out any presumptive limitations for disorders." *SSR 85-15*, 1985 WL 56857, *5-6 (S.S.A. Jan. 1, 1985).  The ALJ, consistent with SSR 85-15, considered the specific ways stress manifested itself for Knapp.  He observed Knapp had increased stress levels in social situations and accordingly restricted him to occasional interaction with others.  (Tr. 16-17.)  In addition to restricting him from a managerial position, the ALJ also limited Knapp to no assembly line or piece rate work, to account for Knapp's difficulty with stress and adaptation. (Tr. 14.)

Further, substantial evidence supports the mental limitations contained in ALJ's RFC determination.  As noted *supra*, the ALJ formulated the following RFC for Knapp:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he could never climb ladders, ropes or scaffolds, he could occasionally climb ramps and stairs.  He must avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery.  He cannot perform work related driving.  The claimant is limited to simple, routine tasks that do not involve arbitration, negotiation, confrontation, directing the work of others or being responsible for the safety or welfare of others. The claimant cannot perform piece rate work or assembly line work.  The claimant is limited to occasional interaction with others.

(Tr. 14.)

The evidence of record supports the mental limitations found by the ALJ.  In 2010, Knapp reported short term memory problems to his neurologist, Dr. McPherson.  (Tr. 353.)  Dr. McPherson diagnosed a "mild memory disturbance" and ordered several diagnostic tests.  (Tr. 356.)  Knapp's EEG and PG300 testing were normal.  (Tr. 351.)  A mini mental status

---

*SSR 85-15*, 1985 WL 56857, *6 (S.S.A. Jan. 1, 1985).

examination, which was otherwise normal, revealed a low Gama IQ score.  (*Id.*)  Knapp began to take Adderall and reported improved cognitive function.  (Tr. 351, 349, 347.)

Knapp did not receive treatment from Dr. McPherson for several years.  (Tr. 305.)  In December 2015, over two years after his alleged onset date, Knapp returned to Dr. McPherson for short term memory issues, which he indicated were exacerbated by stress.  (Tr. 307, 308.)  On examination, he had delayed memory and attention, but normal concentration, judgment, and thought content.  (Tr. 313.)  Knapp did not return to Dr. McPherson for any further treatment of his supposedly disabling memory problems.

Over a year later, in July 2017, Knapp sought treatment at Coleman Professional Services for issues with "memory, paranoia, and focus."  (Tr. 358.)  He indicated it was stressful for him to be around other people and expressed concern about his ability to adapt to change.  (Tr. 359, 366.)  However, on exam, his thought process was logical and his thought content was unremarkable.  (Tr. 370.)  He displayed some issues with recall and response times.  (Tr. 371.)  The ALJ acknowledged this evidence in his decision and accounted for it by limiting Knapp to a light RFC with several environmental and mental restrictions, including restrictions to account for Knapp's struggles with stress and memory.  (Tr. 14-17.)

While Knapp cites to other evidence contained in the record which he believes supports a finding of disability, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion."  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001).  Indeed, the Sixth Circuit has made clear an ALJ's decision "cannot be overturned if substantial evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc.*

25

*Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). In this case, the ALJ clearly articulated his reasons for finding Knapp capable of performing work as set forth in the RFC and these reasons are supported by substantial evidence. Accordingly, Knapp's assertion the evidence of record warrants a different RFC assessment is without merit.

Accordingly, it is recommended the Court find the ALJ did err in his treatment of Dr. Dr. Dallara's opinion and further find the RFC[7] is supported by substantial evidence. This assignment of error is without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: May 13, 2019

---

[7]     The Court notes Knapp, under the same assignment of error, asserts the hypothetical question provided to the vocational expert was unsupported by substantial evidence because it did not include Dr. Dallara's limitations. (Doc. No. 13 at 16.) This argument is simply a reiteration of the arguments the Court has already addressed. As explained *supra*, the ALJ's RFC is supported by substantial evidence. As the hypothetical question to the VE included the same limitations set forth in the RFC, it is also supported by substantial evidence. Where the hypothetical question is supported by evidence in the record, it need not reflect unsubstantiated allegations by the claimant. *See Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990).

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).